Is Ms. Watson on phone? Yes. Ms. Watson, can you hear us? Yes. Yes, I can hear you. Ms. Watson, just in the future, you need to ensure that you have availability for video and if you don't, you need to make arrangements to be here in person. Okay. Will do. I apologize. Counsel for appellant, please proceed. Good morning, your honors, and may it please the court. My name is Catherine Ayton Miller and I represent John O'Brien, the appellant in this matter. I would like to reserve two minutes for rebuttal. Okay, counsel, please be reminded that the time showing is your total time remaining. Thank you. This case involves a claim for supplemental security income based primarily on the impact of social and concentration deficits from depression and anxiety, as well as reactive aggression secondary to a trauma-related history and upper extremity limitations from an occult nerve injury to the left shoulder. The broad issue is whether the ALJ erred in rejecting Mr. O'Brien's SSI claim, and more specifically, we contend that the ALJ erred in rejecting two categories of evidence. The first is Mr. O'Brien's subjective symptom testimony, and the second is the medical opinion of Dr. Silver who provided psychiatric bridge care to Mr. O'Brien until he could establish with specialty care. Turning to Mr. O'Brien's subjective symptom testimony, the ALJ was required to identify specific clear and convincing reasons supported by substantial evidence in the record to reject Mr. O'Brien's testimony. Regarding mental symptoms, Mr. O'Brien testified to difficulty controlling his anger, a history of violent responses to triggers, and he stated that he physically explodes. He stated that he relies on coping techniques two to three times a week, including removing his shoes and socks and digging his toes into the ground and also reliance on a service animal. At the hearing, he stated that he had been triggered four times in the past year, and there is evidence of violent anger to support this testimony with treatment during the relevant period for a fractured wrist when Mr. O'Brien tried to hit someone amiss and struck a wall instead. The ALJ acknowledged Mr. O'Brien's diagnosis, signs, symptoms, and treatment history, and then he selectively relied on essentially normal mental status examination findings, and in particular, he focused on an evaluation report from Dr. Sealth, which predates the relevant period by three years, and he notably disregarded Dr. Sealth's conclusion that mental symptoms could become disabling if Mr. O'Brien's mental illness remained untreated. The ALJ then concluded that the RFC reflects these quote, objective findings, but the problem is that providing a summary of the evidence is not the same as providing clear and convincing reasons to reject a claimant's testimony, and in this case, the ALJ did not identify what testimony he found inconsistent and explain how the evidence undermines that testimony, and in addition, the ALJ's reasoning is improperly selective and it's not supported by substantial evidence in the record, which documents poor hygiene, labile affect, quiet and wary presentation. Mr. O'Brien sometimes spoke in low tones. He presented with impaired concentration, memory, insight, and judgment. He demonstrated tangential thought processes, sleep problems, passive suicidal ideation, some homicidal ideation and thoughts of harm to others. He reported ongoing aggression, threats, yelling, explosive and frightening behaviors. He was sometimes non-cooperative. He was rambling and nonsensical. He reported that he would shake and rock when he was triggered and that this happened on a daily basis. Dr. Welch-Pemberton found that Mr. O'Brien was unlikely to benefit from brief treatment and she opined that he required long-term outpatient therapy. Dr. Silver similarly concluded that Mr. O'Brien required specialty mental health care due to the severity and chronic nature of his symptoms, and during the relevant period, there was a period of exacerbated symptoms during which Dr. Silver actually referred Mr. O'Brien to crisis care and Mr. O'Brien failed to arrive, so Dr. Silver had to and contact Mr. O'Brien's spouse to ensure both Mr. O'Brien's safety and the safety of those around him, but the ALJ declined to consider this evidence and instead selectively summarized only benign findings. He also thoroughly summarized Dr. South's findings from three years prior to the relevant period, despite evidence that also predates the relevant period, which documents that Mr. O'Brien was jailed for assaulting and threatening his sister, which is consistent with his testimony that he becomes physically violent when triggered. We maintain that there is no evidence of sustained improvement such that Mr. O'Brien became capable of working or was no longer disabled. We also maintain that his reported activities are consistent with his alleged limitations. Regarding his shoulder impairment, Mr. O'Brien testified to constant pain in the left shoulder, numbness in the left arm, limited range of motion, inability to lift with the left arm. He stated that he had to use his right arm to help raise the left arm above his head. The ALJ summarized normal imaging and electrodiagnostic findings and focused on essentially normal examination findings. He also acknowledged treatment. Assuming, I guess, bottom line, the RFC does incorporate a number of limitations, including a limitation to only occasional interactions with co-workers or supervisors, no interaction with the general public in a static work environment. So, I guess, even if we, you know, agreed with you, what difference in the RFC do you think was required? So, the problem with Mr. O'Brien's testimony and what Dr. Silver's opinion also highlights is that he has a low distress tolerance. And so there's no limitation with regard to the level of stress in the average workplace. And the vocational expert testified that there's no tolerance for anger response in the workplace. So, our position is that Mr. O'Brien is incapable of engaging in violence in a negative environment based on his low distress tolerance because he has a violent and aggressive response to triggers. And even one violent response in the workplace would be disabling. He testified that he had had four violent responses just that year. Counselor, did you want to save the balance of your time for rebuttal? I can do that if there are no further questions. All right. Thank you. Let's hear from the government. Good morning, Your Honor. Katherine Watson for the Commissioner of Social Security. Because the OJ reasonably evaluated the subjective symptom testimony and the opinion evidence in this case, it is our position that this court could affirm. I'd like to briefly address Your Honor's point that a lot of O'Brien's symptoms concerning his difficulties with others were accommodated in the RFC. As opposing counsel pointed out, he did allege low distress tolerance, but he specifically alleged that he was triggered by yelling and screaming. And that's on car 38 and also on car 391. The OJ asked the vocational expert, would yelling and screaming be something that would trigger the OJ? The OJ responded that it would not. And so the OJ accommodated, but the OJ, despite the trigger that would not be there in a workplace setting, the OJ nevertheless accommodated his documented social difficulties by limiting him to occasional interaction with coworkers and supervisors, as well as no interaction with the general public. The extent, however, though O'Brien alleged more severe symptoms and limitations, the OJ reasonably provided valid reasons to discount his testimony. And I'll also note that he also accommodated his shoulder impairments and found that he could never reach overhead with his left upper extremity. So turning to his mental health impairments on car 20, the OJ found that there was improvement in his symptoms with therapy and medication. I note that he does have a history of violence. Most of that history predates the relevant period. In fact, prior to the relevant period, he was diagnosed with intermittent explosive disorder. His symptoms improved so much with treatment that even by the relevant period, he no longer met the criteria with that diagnosis. The OJ cited to a transcript note during the relevant period from November 2018, where O'Brien himself stated that he was doing very well from a mental health perspective, that his symptoms had vastly improved since establishing care with his primary care physician. This is on car 396 and 392. And the corresponding mental status examination had normal findings, including normal mood, normal affect, and normal behavior significantly. In April 2019, O'Brien, in fact, denied depression, anxiety, and behavioral problems. And again, the corresponding mental status examination showed normal mood, affect, and behavior. And he also had largely unremarkable mental status examinations. There are some remarkable findings, as opposing counsel pointed out, but on the balance, his mental status examinations during the relevant period were largely unremarkable, and the OJ also considered that evidence as well. Turning to Dr. Silver's opinion, I'd like to note that the OJ reasonably similarly found that this opinion was inconsistent with the improvement that I've noted. So again, the OJ again pointed to these inconsistencies. Again, cited to this transcript site that he was doing well from a mental health perspective by November 2018. Earlier in the decision, the OJ also discussed Dr. Silver's treatment notes. The bulk of his examinations showed largely normal mental status examinations. And in addition, even if this court finds that the OJ erred with respect to his evaluation of Dr. Silver's opinion, plaintiff would still have the burden of showing harmful errors. So there would be an independent analysis required by this court to determine whether that error was harmful, which our case law defines as whether that error was inconsequential to, excuse me, if it's harmless, then it would be inconsequential to the ultimate non-disability determination. It is also our position that plaintiff could not meet, O'Brien could not meet that burden here. And the reason for that is even by Dr. Silver's own admission, he did not provide any specific limitations. He stated himself that specific limitations were beyond the focus of his treatment settings. So he instead offered very generalized admissions. And under case law, for example, MENAL v. ATCEL, a lack of specific limitations are not useful in a disability determination. MENAL specifically stated that only specific findings with respect to medical opinions are useful in a disability determination. So generalized statements that somebody might have some unspecified limitation in functioning fall short of an informed opinion under MENAL. And it is too generalized, and therefore, they're not useful in a disability determination. And his statements could not meet, could not show, and therefore, this court could not find harmful error. I'd also note that his statements that she would struggle to maintain full-time work under our regulations are not considered valuable or persuasive evidence. Our regulations specifically state statements concerning whether a claimant is able or unable to perform regular or continuing work are not considered useful or valuable statements. And then he also made two very generalized statements that his ability to struggle, that he may have some struggle with feedback or criticism. Again, he didn't state the degree of that struggle. But again, that limitation to the extent it's considered a limitation would be accommodated by the RFC, which again limits him to only occasional interaction with coworkers and supervisors and no interaction with the general public. And finally, Dr. Silver made a very generalized statement that his low distress tolerance would likely impact his ability to maintain attention and concentration. And I note here that all of the jobs that the AOJ found at step five were unskilled jobs. They all required only a level two reasoning. Under our finding case law here, a level two reasoning is consistent with simple work. It would accommodate up to moderate limitations in concentration and attention. And so, to the extent that these generalized limitations are considered specific limitations or are considered relevant or useful, they're adequately accommodated in the RFC. And so, for these reasons, we feel that this court should affirm the evaluation of the claimants of the symptom testimony and also Dr. Silver's statements. All right. And finally, I'd also... Yes. You have something else, counsel? I just briefly note that finally, with regard to his left shoulder pain, the AOJ on CAR-20, in addition to the general normal findings, both with respect to evaluations, also the ultrasound nerve conduction studies, the AOJ found on CAR-20 that his treatment was very conservative, primarily with medication or over-the-counter medication. There's substantial evidence supporting this finding. And in fact, during most of the relevant period, he was not taking medication at all, even though he noted that previously, his pain had been fairly well managed with medication. And so, for this reason as well, we respectfully request that this court should affirm. All right. Rebuttal? Thank you. Much of what opposing counsel just had to say is not contained within the four corners of the AOJ's decision, at least with regard, at a minimum, with regard to Dr. Silver's opinion. The AOJ did not state that Dr. Silver provided a conclusory opinion on an issue reserved to the commissioner. Instead, what the AOJ did was, he very generally stated that Dr. Silver's opinion was inconsistent with the overall record. And he then pointed to Dr. South's evaluation report, which predates the relevant period by three years. And it's notable as well that, you know, on page 19 of the transcript, the AOJ spent a full paragraph summarizing Dr. South's findings and another paragraph at the bottom of the page, which highlights only normal mental status examination findings. And so, while my friend has highlighted that there are actually positive findings within the record, the AOJ did not do that in his decision. And so, the other thing that the AOJ did not do was acknowledge the history of violent aggression. And there are actually more than one instance of violence within the relevant period. You know, there's the issue of the fractured wrist, where he tried to strike someone and hit a wall instead. And there's also the period of time where Dr. Silver had to request a welfare check. And that was because Mr. O'Brien was making threats about his wife. So, he was having homicidal... Yes? Is it fair to say that the RAFC incorporated Dr. Silver's limitations regarding social interaction? I think that the bigger problem with Dr. Silver's opinion is that he is... Could you answer that question? Is it fair to say that the AOJ incorporated the limitations that were articulated by Dr. Silver regarding social interaction into the RAFC? So, Dr. Silver did not make a specific... Did not provide a specific opinion about frequency of interactions or... The only thing that Dr. Silver provided was an opinion about his ability or inability to sustain in a full-time competitive environment. Right. And so, weren't those limitations incorporated into the RAFC with the social interaction limitations? If an RAFC is a person's ability to sustain over time, then no, that is not consistent with Dr. Silver's opinion that he cannot sustain full-time competitive work. So, Dr. Silver declined to provide specific limitations. He did not state that there's some specific frequency with which Mr. O'Brien could sustain social interaction specifically. But... But... We acknowledge this. But the medical experts don't make the determination of whether or not someone can work. They make the determination of what the patients... Of what the claimant's limitations are. And then it's up to the ALJ to decide whether or not those limitations can... Can be accommodated so that the person can work. So, Dr. Silver saying he can't work is not a medical opinion. Dr. Silver stated that he cannot sustain full-time work. He stated that he cannot sustain eight hours a day, five days a week on an ongoing basis. The problem here is that the ALJ did not reject that opinion as an issue... Well, the ALJ doesn't have to consider that. ...that the commissioner can determine. The ALJ did not consider it on that basis. Counsel, the problem is the ALJ doesn't have to consider that because that's not the doctor's bailiwick. That's the ALJ's bailiwick to determine. I'm sorry. I'm not able to hear you. That's not my problem, Counsel. Can you hear me now? Yes. Can you hear the judge? Allie? I'm sorry. I'm not able to hear you. Can you hear? Can you hear this? Can you hear this? Can you hear now? Okay. I think the problem's on her end. I think so, too. That's the difficulty. She's over time. She's over time anyway. All right. So, the case just argued is submitted for a decision by the court because we can no longer communicate with... Judges, are you able to hear me? This is Callie. I'm sorry. Callie? I think the problem is on her end. Okay. I'm unable to hear the courtroom. Judges, please stand by. I'm going to reconnect the courtroom to the call. All right. Maybe it wasn't her. Sorry. All right. All right. All right. All right. All right. All right. All right. The court will be in recess for five minutes. All rise. All right. Recording in progress. Judges, are you able to hear me? This is Kathy. The judges have called a brief recess. Understood. Okay. Please stand by. I'm getting video back on your end. This is the bench. Can you hear that? Yes. Did the last person disconnect? Ms. Eichten? No, Eichten Miller is still on the call. Okay. Ms. Eichten Miller, are you there? Ms. Eichten Miller, are you there? Ms. Eichten Miller, are you there? Okay, Kathy, we're ready to go again. Are we connected to Eichten Miller? Yes, everybody is still present. Okay. I'll let the judges know. Thank you. Ms. Eichten Miller, are you there? Ms. Eichten Miller, are you there? All rise. The court shall now resume its session. Thank you. All right. Ms. Eichten Miller, when we lost contact, I was asking you whether or not that was within the bailiwick of the doctor to determine how many days a week or how many hours a day the claimant could work. I see it routinely in cases that medical providers will provide an opinion as to how many days of work a person could anticipate missing. They are not making that statement as a vocational expert. The vocational expert comes to the hearing and testifies about whether or not those limitations are disabling. So they're not stating this person is disabled. They're stating this person can or cannot sustain five days a week, eight-hour days. So then why would the ALJ err if he does not accept that opinion from the doctor, if that's not the doctor's charge to make that call? How could the ALJ err then if the doctor, if that's not within the scope of the doctor's role in the hearing? Well, the doctor in this case, Dr. Silver, did not provide a vocational expert analysis on whether this is disabling. What he stated is that Mr. O'Brien is not capable of sustaining, and then the ALJ did not actually consider that and identify specific evidence that is inconsistent with it, other than to identify Dr. South's evaluation report. Let me ask you this. Do you have a case that supports your argument that the ALJ must respond to a doctor's opinion that talks about how many hours in a work day or how many days in a work week a claimant can perform? What case says that? Well, the regulations require the ALJ to consider medical opinions. But that's not a medical opinion. That's not an opinion about medical issues. That's an opinion about sustainability of work hours. So do you have a case that says if a doctor talks about how many hours in a day a claimant can work or how many days in a week a claimant can work, the ALJ must consider that and discuss it. What case says that? I'd like to respond to your question in two parts. So the first is Hill v. Astru. Yes, the first is Hill v. Astru, which is a case that in that particular case, the medical opinion and I did not cite this in my briefing and that is because my second part to this answer is that the ALJ did not reject this. Again, the ALJ did not reject Dr. Silver's opinion as something reserved to the commissioner. The ALJ simply cited Dr. Sealth's evaluation findings, which are outdated. So our argument specific to this case is that the ALJ did not properly consider Dr. Silver's opinion. Hill v. Astru, just to answer your specific question, is a case that has a medical opinion in which the physician said something fairly vague, something like this person cannot sustain work in an even more vague manner than Dr. Silver's opinion in the case at bar. So it is something that under the regulations, the regulations have actually changed since Hill. And so that's why I didn't cite it in our case, because the problem in this particular case is that the ALJ is required to consider the medical opinions in the record based on the most important factors of supportability and consistency. And to the extent that the ALJ did that here, he cited only Dr. Sealth's evaluation report. And so we, we maintain that the ALJ did consider this as a medical medical opinion and did state that it was unpersuasive. However, he did not properly apply the regulatory factors and provide an adequate explanation of his reasoning for rejecting Dr. Silver's opinion. Thank you counsel. Far exceeded my time. Thank you. Are there any other questions? No. All right. Thank you to both counsel. The case just argued is submitted for decision by the court. The next case on calendar for argument is Shaquan Morales v. Garland.
judges: RAWLINSON, BEA, SUNG